******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FAIRFIELD MERRITTVIEW LIMITED PARTNERSHIP
*v.* CITY OF NORWALK ET AL
(AC 34950)

Alvord, Sheldon and Harper, Js.

*Argued October 27, 2016—officially released April 11, 2017*

(Appeal from Superior Court, judicial district of Stamford-Norwalk, Hon. Arnold W. Aronson, judge trial referee)

*James R. Fogarty*, with whom, on the brief, were *Frank W. Murphy* and *Kara A. Murphy*, for the appellants (plaintiff et al.).

*Carolyn M. Colangelo*, assistant corporation counsel, with whom were *Mario F. Coppola*, corporation counsel, and, on the brief, *Robert F. Maslan, Jr.*, former corporation counsel, for the appellees (defendants).

*Opinion*

SHELDON, J. In this real estate tax appeal, the defendant city of Norwalk[1] appeals from the judgment of the trial court sustaining the appeal of the plaintiff, Fairfield Merrittview SPE, LLC,[2] pursuant to General Statutes § 12-117a,[3] and ordering the reduction of the defendant's tax assessment levied against the plaintiff's real property. The defendant raises two arguments in support of its claim that the court erred when it reduced the subject property's assessed fair market value, as of October 1, 2008, from $49,036,800 to $34,059,753.[4] First, the defendant claims that the court improperly relied upon a 2006 "annual income and expense report" to calculate the property's net rentable area, when instead it should have used the plaintiff's December 2008 rent roll for that purpose, because the 2008 rent roll assertedly reflected the subject property's net rentable area as of October 1, 2008, more accurately than the 2006 report. Second, the defendant argues that the court improperly excluded $190,000 of "other income" attributable to the subject property from its calculations and, therefore, the court's calculation regarding the property's potential gross income was clearly erroneous. We affirm the judgment of the trial court.

The record reveals the following facts. The subject property, an eight story, class A multitenant office building that was constructed in 1985, sits on a 4.3 acre parcel located at 383 Main Avenue in Norwalk. The ground floor of the property consists of a lobby, a cafeteria, a fitness center and a conference room, which are all maintained for the benefit of the building's tenants. These amenities account for approximately 6400 square feet of space. Additionally, there is a three level parking garage underneath the building which provides 743 parking spaces on a total surface area of 150,227 square feet. The area surrounding 383 Main Street consists of high density commercial developments, as well as retail and corporate offices. The subject property's location provides quick access to: the Merritt Parkway; the Route 7 connector highway, which provides access to Interstate 95; and the Metro-North passenger train station, which operates between New Haven and New York City.

On October 1, 2008, as part of a citywide revaluation, the defendant's assessor determined that the subject property had a fair market value[5] of $49,036,800. Thereafter, the plaintiff appealed to the Board of Assessment Appeals of the City of Norwalk (board), pursuant to General Statutes § 12-111,[6] claiming that the property's assessed value grossly exceeded its actual value.[7] The board dismissed the appeal and upheld the property's assessed value and corresponding tax assessment. On July 21, 2009, the plaintiff appealed, pursuant to § 12-117a, to the Superior Court for the judicial district of Stamford-Norwalk. There, the plaintiff renewed its

claim that the defendant's assessment of the subject property was grossly excessive, and therefore warranted reduction. A two day trial was then held on December 14 and 15, 2011.

During the trial, each party called an appraiser to testify as to the subject property's October 2008 fair market value. Eric Michel testified on behalf of the plaintiff; Michael Fazio testified on behalf of the defendant. Both witnesses stated that they employed the sales approach[8] and the income capitalization approach[9] to determine the property's fair market value. Ultimately, each appraiser testified that the income capitalization approach was the most appropriate method for determining the property's fair market value as of October 1, 2008 because a prospective purchaser would most likely use that method when attempting to purchase the property.[10] Using the income capitalization approach, Michel concluded that the property had a fair market value of $30,500,000 as of October 1, 2008, whereas Fazio concluded that the property then had a fair market value of $49,400,000.

Despite their different conclusions, both appraisers agreed on several factors relevant to the trial court's decision. Both appraisers agreed: that the property's highest and best use,[11] as improved, was its continued use as a multitenant office building; that, in applying the income capitalization approach, the direct capitalization method[12] was the preferred method for determining the property's fair market value; that, pursuant to the direct capitalization method, the applicable vacancy and collection rate was 10 percent; and that the property's market rental value, pursuant to General Statutes § 12-63b,[13] should be valued at $25 per square foot. They disagreed, however, on several figures included in the direct capitalization formula. Specifically, they disagreed as to: (1) the property's net rentable area; (2) the property's potential gross income; and (3) the overall capitalization rate[14] that should be applied under the direct capitalization formula. Their differences, more particularly, were as follows.

Regarding the property's net rentable area, Michel testified that his calculation was based upon the tax assessor's field assessment card, which reported that the property had a net rentable area of 238,879 square feet. Fazio's calculation, on the other hand, was based on an oral representation by Tara Deluca, an agent of the plaintiff, that the property had a net rentable area of 256,974 square feet.

As for the property's potential gross income (PGI), Michel testified that he multiplied the market rental value of $25 per square foot, on a "gross electric basis,"[15] by 238,879 square feet of net rentable area to arrive at a PGI of $5,971,975. Fazio's calculation, by contrast, resulted in a PGI of $7,847,825. Although Fazio agreed that the market rental value was $25 per square foot,

he included two additional reimbursements which he found to increase the property's value by $4.80 per square foot.[16] Additionally, Fazio's formula included $190,000 in "other income" that he believed to be attributable to the property, which included "conference room income, tenant other income, and . . . interest income."

Concerning the overall capitalization rate, both appraisers agreed that as of October 1, 2008, the capitalization rate was 7.5 percent. They disagreed, however, as to what effective tax rate should be added to that figure to arrive at the overall capitalization rate; Michel testified that 1.35 percent should be added, resulting in an overall capitalization rate of 8.85 percent, while Fazio testified that 1.39 percent should be added, resulting in an overall capitalization rate of 8.89 percent.

On August 6, 2012, the trial court, *Hon. Arnold W. Aronson*, judge trial referee, issued its memorandum of decision. With regard to the property's net rentable area, the court noted that several documents admitted into evidence reflected dramatically different figures and that, depending on which exhibit it relied upon, the property's net rentable area varied by approximately 15,000 square feet. After reviewing the evidence presented, the court concluded that it was " more credible to turn to the 2006 annual income and expense report filed by [the plaintiff] with the city's assessor, as required by General Statutes § 12-63c, showing the subject's gross square footage at 249,986 [square feet] and [net rentable area] at 243,586 [square feet]."[17] With regard to the property's PGI, the court rejected Michel's proposal of $25 per square foot on a gross electric basis as well as Fazio's inclusion of reimbursements and "other income." Instead, the court compared the subject property's market rent to its contract rent and concluded that a value of $26 per square foot was "a fair resolution of the subject's potential gross income, as of October 1, 2008." Accordingly, the court multiplied the market value of $26 per square foot by the net rentable area of 243,586 square feet, resulting in a PGI of $6,333,236, as of October 1, 2008.[18] Finally, with regard to the overall capitalization rate, the court adopted Fazio's proposed overall capitalization rate of 8.89 percent. Applying these figures to the direct capitalization formula, the court concluded that the subject property's fair market value, as of October 1, 2008, was $34,059,753. Because this figure was less than the defendant's assessment of $49,036,800, the court ordered a reduction in the assessment to reflect the difference in the property's fair market value. Thereafter, the defendant filed its appeal.

Additional facts will be set forth as necessary.

I

The defendant first claims that the court's factual finding regarding the property's net rentable area was clearly erroneous. Specifically, the defendant argues that, in determining the net rentable area of the property, the trial court improperly relied on a 2006 annual income and expense report to determine the building's gross square footage. See footnote 17 of this opinion. The defendant argues that the information in that report as to the property's net rentable area was outdated, and thus that the court should have used the plaintiff's 2008 rent roll to determine that area instead. The defendant contends that, by relying on such outdated information, the court failed to account for 14,687 square feet of net rentable area, thereby erroneously reducing the property's fair market value by $3,865,870. We find no error.

"Our review of the court's determination in a tax appeal is limited. [W]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine [if] it is legally correct and factually supported. . . . We will reverse the decision only if it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Pilot's Point Marina, Inc.* v. *Westbrook*, 119 Conn. App. 600, 602, 988 A.2d 897 (2010). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Albemarle Weston Street, LLC* v. *Hartford*, 104 Conn. App. 701, 706, 936 A.2d 656 (2007).

"[I]n an appeal pursuant to § 12-117a, the trial court tries the matter de novo and the ultimate question is the ascertainment of the true and actual value of the [taxpayer's] property." (Footnote omitted; internal quotation marks omitted.) *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997). "Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier." (Internal quotation marks omitted.) *Konover* v. *West Hartford*, 242 Conn. 727, 735, 699 A.2d 158 (1997); *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 103, 626 A.2d 1292 (1993). "The trier arrives at his own conclusions as to the value of land by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and his own general knowledge of the elements going to establish value including his own view of the property." *O'Brien* v. *Board of Tax Review*,

169 Conn. 129, 136, 362 A.2d 914 (1975). "Because a tax appeal is heard de novo, a trial court judge is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Emphasis omitted; internal quotation marks omitted.) *Aetna Life Ins. Co.* v. *Middletown*, 77 Conn. App. 21, 28, 822 A.2d 330, cert. denied, 265 Conn. 901, 829 A.2d 419 (2003). "The court has wide discretion in the admission of evidence and in determining what weight to give any such evidence." *Nolan* v. *Milford*, 92 Conn. App. 607, 609, 886 A.2d 493 (2005).

The defendant claims that the court erroneously relied upon the plaintiff's 2006 annual income and expense report.[19] We disagree. The evidence regarding the property's net rentable area consisted of exhibits and trial testimony; we address each in turn.

Throughout the course of the two day trial, the court received several pieces of documentary evidence regarding the property's net rentable area, including: the plaintiff's 2006, 2007, and 2008 rent rolls; the city assessor's field card; and the plaintiff's 2006 annual income and expense report. A review of these documents reveals that the plaintiff's December 2006 rent roll, January 2007 rent roll, and 2006 annual income and expense report consistently stated that the subject property had a gross building area of 249,986 square feet. The plaintiff's December 2007 rent roll, however, reported a gross building area of 260,147 square feet, reflecting an increase of approximately 10,200 square feet. Similarly, the plaintiff's December 2008 rent roll reflected an additional increase of approximately 4500 square feet, resulting in a gross building area of 264,673 square feet.

In addition to these documents, the court heard testimony from both appraisers regarding the property's net rentable area. On direct examination, Michel testified that when he calculated the property's fair market value, he relied on the 2008 tax assessor's information, which reported that the property had 238,879 square feet in rentable area. Michel explained that, by using this figure, he was able to compare his appraisal to the tax assessor's appraisal using identical information. Michel testified on cross-examination that, before he performed his appraisal, he reviewed twelve years' worth of information on the subject property and noted that its net rentable area ranged from 230,000 to 260,000 square feet throughout that period. Michel testified that this was an indication that the net rentable area of the property varied depending on the market. Michel also testified that the city assessor's field cards often reflected the assessor's personal opinion as to the property's net rentable area and that, often times, such information was incorrect. Michel explained, however, that he had no reason to believe that the tax assessor's information in this case was incorrect. Michel also

stated that he reviewed the plaintiff's rent rolls between 2006 and 2008 and that the discrepancies reflected in those exhibits did not alter his conclusion.

The following day, the defendant's appraiser, Fazio, testified as to his appraisal of the property. On direct examination, Fazio stated that "there [are] several square footages that are delineated for the subject property depending on what document you look at." Fazio also testified that he disagreed with Michel's reliance on the assessor's records, and instead that he relied on an oral representation by Tara Deluca, an agent of the plaintiff, who stated that the property's size was 256,974 square feet. Cross-examination revealed, however, that this oral representation was made during a later on-site inspection of the property in 2011. Fazio admitted that he did not make any notes regarding his conversation with Deluca and that he was unsure whether the figure she gave him included nonrentable areas of the property as well. Finally, Fazio testified that his net rentable area calculation included the 6400 square feet in common areas because he believed that the tenants owned an equal share of these spaces and, as such, their rent per square foot included a percentage of the common areas.

On the basis of Michel's and Fazio's conflicting testimony, we conclude that the trial court reasonably could have discredited both witnesses' testimony as it related to the property's net rentable area. As discussed in the preceding paragraphs, "the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . [T]he trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002). In this case, Michel stated that net rentable area is calculated by subtracting the common area from the gross building area and that the assessor's information reflected a net rentable area of 238,874 square feet. A closer inspection of the assessor's information, however, reveals that this figure of 238,874 square feet *included* the 6400 square feet of common space area. As such, it was reasonable for the court to discredit Michel's testimony as to the property's net rentable area. Likewise, the court reasonably could have discredited Fazio's testimony regarding the property's net rentable area of 256,974 square feet on the grounds that he relied solely on an oral representation made three years after the revaluation date and that he was unsure whether this figure included nonrentable areas.

With regards to the documentary evidence admitted at trial, we conclude that the court reasonably could have found that the net rentable area of the property was 243,586 square feet. In its memorandum of decision, the court recognized the different net rentable area

figures contained in the plaintiff's 2006, 2007, and 2008 rent rolls. The trial court considered these documents and ultimately determined that it was more appropriate to rely on the 2006 annual income and expense report. We have consistently held that "[t]he court has wide discretion in the admission of evidence and in determining what weight to give any such evidence." *Nolan* v. *Milford*, supra, 92 Conn. App. 609. In this case, "[t]he court was required . . . to consider the evidence it admitted. . . . It did so and determined what weight to give to the evidence . . . ." (Citation omitted.) Id., 610–11. The court's factual finding that the property had a net rentable area of 243,586 square feet was adequately supported by the evidence admitted and was not based upon an erroneous rule of law. *O'Brien* v. *Board of Tax Review*, supra, 169 Conn. 135–37. Accordingly, we conclude that the court's finding, as it relates to the net rentable area, was not clearly erroneous.

## II

The defendant's final claim is that the trial court improperly excluded $190,000 in "other income" attributable to the property when it calculated the property's potential gross income. We disagree. As a preliminary matter, we note that the defendant's proposed addition of $190,000 in "other income" is derived from a 2007 audit report that was admitted at trial. This $190,000 figure is comprised of three separate items: $165,637 of interest earned on a money market account; $14,264 of conference room income; and $10,300 of "tenant other income." Each will be addressed in turn.

### A

### Tenant Other Income

We quickly dispose of the defendant's claim that the trial court's potential gross income calculation should have included $10,300 attributable to "tenant other income." Although Fazio testified that he included this figure in his calculation of the property's potential gross income, he admitted that he did not know what this figure actually represented. The defendant failed to produce additional testimony or other evidence clarifying what was contained within this figure. Accordingly, the court was well within its province, as the trier of fact, to conclude that this figure should not be added to the property's potential gross income.

### B

### Interest Income

We now address whether the court improperly excluded $165,637 of interest income derived from the plaintiff's money market account. In its memorandum of decision, the trial court excluded this income from its computation of the property's potential gross income and concluded that "$26 [per square foot] is a fair resolution of the subject's potential gross income, as of Octo-

ber 1, 2008." The defendant argues that the court's failure to include this income was clearly erroneous, and that our decision in *Pilot's Point Marina, Inc.*, requires us to conclude that the court committed reversible error. We disagree.

In *Pilot's Point Marina, Inc.*, the plaintiff owned one of the largest marinas in New England. *Pilot's Point Marina, Inc.* v. *Westbrook*, supra, 119 Conn. App. 601. On October 1, 2006, the defendant town assessed the property at a value of $19 million. Id. The plaintiff appealed that assessment, pursuant to § 12-117a, and argued that the property's fair market value as of that date was $15,700,000. *Pilot's Point Marina, Inc.* v. *Westbrook*, Superior Court, judicial district of Middlesex, Docket No. CV-07-4007441-S, 2008 WL 4926930, *1 (November 6, 2008), rev'd, 119 Conn. App. 600, 988 A.2d 897 (2010). The trial court reviewed the town's assessment de novo and found, in part, that the marina generated $1,611,042 from slip rentals as well as winter and summer storage fees. Id., *3. The court, however, "failed to include $102,192 of summer storage income in its final EGI [effective gross income] calculation [pursuant to the income capitalization method]. The court articulated its omission by explaining that it was aware of the income generated through summer storage but chose to disregard it because most marinas do not offer summer storage, and, therefore, the summer storage income realized by the plaintiff was not representative of the market." *Pilot's Point Marina, Inc.* v. *Westbrook*, supra, 119 Conn. App. 603. Ultimately, the trial court concluded that the property had been overvalued, and so it reduced the town's assessment by approximately $2 million. Id., 602.

On appeal in *Pilot's Point Marina, Inc.*, we agreed with the defendant that the court's failure to include the summer boat storage income was clearly erroneous. Id., 603–604. In doing so, we held that "[p]ursuant to § 12-63b (b), the court is required to consider both market rent and actual rent when determining fair market value using the income capitalization method. . . . Moreover, if the property is devoted to the use for which it is best adapted and is in a condition to produce or is producing its maximum income, the actual rental is a very important element in ascertaining its value. . . . Consequently, in light of the actual income generated by the property through summer boat storage, the court's failure to include any summer storage income in its final EGI calculation was improper." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id.

The defendant argues that the interest income derived from a money market account is "no more or less attributable to the land" than the summer boat storage income in *Pilot's Point Marina, Inc.* We are unpersuaded.

As a preliminary matter, we note that in *Pilot's Point Marina, Inc.*, both the plaintiff's and the defendant town's appraisers agreed that the income derived from summer boat storage was income attributable to the property; they merely disagreed as to how much income was derived from those rentals for the revaluation year of 2006. See *Pilot's Point Marina, Inc.* v. *Westbrook*, supra, Superior Court, Docket No. CV-07-4007441-S, 2008 WL 4926930, *2–4. Nonetheless, the trial court excluded this income from its calculations on the ground that the plaintiff "basically establishes its own market," in that it was the only local marina that had the ability to earn income from summer boat storage. Id., *3. Thus, although the parties agreed that the income from summer boat storage was, in fact, attributable to the property, the court excluded such income from its calculations because it did not believe that it accurately reflected the earning capacity of similarly situated marinas. See id.

In the present case, however, the parties' appraisers disagreed as to whether this "interest income" was attributable to the property itself. Specifically, Fazio opined that the interest income derived from the plaintiff's money market account should be included in the property's potential gross income because "the interest is . . . from the income derived from the building" and was thus, in his judgment, "income to the building." Michel, however, disagreed, testifying that interest and dividends should not be included as income under the direct capitalization method because, in his opinion, this income is unrelated to the property. Instead, he stated, "It's relative to the ownership and how they handle their . . . money." Michel also testified that, in his twenty-five years of experience, he had never included interest income when calculating a property's fair market value pursuant to the income capitalization approach. Thus, unlike the court in *Pilot's Point Marina, Inc.*, the trial court in this case had to resolve the threshold issue of whether this income was attributable to the property and thus should be included in the court's computation of the property's potential gross income.

We have long dichotomized between income attributable to the plaintiff's real estate and income attributable to the plaintiff's business for purposes of tax assessments. *Whitney Center, Inc.* v. *Hamden*, 4 Conn. App. 426, 427, 494 A.2d 624 (1985). In *Whitney Center, Inc.*, the trial court reduced the defendant town's assessments for the plaintiff's life care center during the taxable years of 1981 and 1982. Id. Although the appraisers agreed as to "the correct method for valuation, the appraisers disagreed on which components of the plaintiff's total income should be attributed to the real property rather than to the business, and on the valuation of those components." Id., 428–29. On appeal, the defen-

dant claimed that the trial court "erred in relying upon an appraisal that did not include a calculation of maximum income"; id., 427; which the defendant argued should have included "a lump sum entrance endowment and a monthly service fee thereafter for the rights and services provided by the plaintiff." Id. We affirmed the judgment of the trial court and held that "[f]or assessment purposes, the value of the plaintiff's real estate must be distinguished from the value of its business since it is the realty itself which is subject to the property tax assessment." Id.

In light of the conflicting testimony presented in this case, the trial court reasonably could have found that the plaintiff's interest income was not attributable to the property. We are again reminded that "the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . [T]he trial court is privileged to adopt whatever testimony he reasonably believes to be credible." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, supra, 262 Conn. 26. The court therefore was within its province to credit the testimony of Michel, an appraiser with twenty-five years of experience, and exclude this figure from its computations. Under our deferential standard of review, the court's findings "must stand unless there was an error of law or a legal or logical inconsistency with the facts found." (Internal quotation marks omitted.) *Whitney Center, Inc.* v. *Hamden*, supra, 4 Conn. App. 429–30. The court's decision to exclude this "interest income" was consistent with Michel's testimony and was adequately supported by the record. We have found no law for the proposition either that the trial court *must* consider an interest bearing account in performing such calculations or that its failure to do so constitutes reversible error. See *Redding Life Care, LLC* v. *Redding*, 308 Conn. 87, 106–11, 61 A.3d 461 (2013) (permitting—but not requiring—the trial court to consider a hypothetical entry fee escrow account in its valuation of the subject property). Accordingly, we conclude that the court's finding, as it relates to the "interest income," was not clearly erroneous.

## C

### Conference Room Rental Income

Lastly, we address the defendant's argument concerning $14,264 in conference room income. At trial, the plaintiff presented the testimony of Jeffrey Newman, the executive vice president of Malkin Properties, which is the company that managed the marketing and leasing of the subject property. Newman testified that the conference room, fitness center, and dining area were for tenants only, and that these areas "are not leased to tenants, but they're available for use by tenants." With respect to the conference room, Newman testified that tenants were able to "call us up and reserve

it."[20] Later that day, Michel was asked a series of questions regarding the property's "other income." Michel stated that the conference room was "an amenity provided to the tenants, and you can't achieve rent on that." This testimony was consistent with the plaintiff's 2006, 2007, and 2008 rent rolls, which consistently stated that the conference room has a rent potential of zero dollars.

The following day, Fazio testified as to the conference room income. On cross-examination, Fazio conceded that the references within the plaintiff's 2006, 2007, and 2008 rent rolls stated that the "rent potential" and "rent actual" from the conference room was zero dollars. He maintained, however, that he believed that the tenants were required to pay a fee to use the conference center, it was not part of the tenant's monthly rent, and, therefore, it was considered "income to the building." This opinion was consistent with the plaintiff's 2006 annual income and expense report, which reported a year-to-date income of $6450 from the conference room in 2006, as well as a 2007 audit statement, which reported a year-to-date income of $14,264 in 2007. The defendant failed, however, to elicit any information from either Fazio or Newman as to the regularity of these rentals, the rate charged by the plaintiff, or the costs incurred by the plaintiff in renting this space.

In the absence of such additional facts, we cannot conclude that it was clearly erroneous for the court to exclude this figure from its potential gross income calculation. In *Pilot's Point Marina, Inc.*, the trial court received comprehensive testimony from both appraisers as to the regularity of summer boat storage rentals; the average length of such rentals and the corresponding effect on the income generated by such rentals; and the income earned over the course of several years of storage rentals. *Pilot's Point Marina, Inc.* v. *Westbrook*, supra, Superior Court, Docket No. CV-07-4007441-S, 2008 WL 4926930. The record in this case, by contrast, lacks comparable information as to the conference room rentals. At most, the court was presented with conflicting testimony and evidence as to whether the conference room could be considered income attributable to the property, whether the conference room was able to achieve a regular and consistent income stream and, even if that was established, which figure most accurately represented that income stream on a yearly basis. We are reminded once again that "[t]he process of estimating the value of property for taxation is, at best, one of approximation and judgment, and there is a margin for a difference of opinion." (Internal quotation marks omitted.) *Carol Management Corp.* v. *Board of Tax Review*, 228 Conn. 23, 39–40, 633 A.2d 1368 (1993). Here, the court was presented with sufficient evidence to reasonably conclude that the property did not receive income from the conference room. Alternatively, the court reasonably could have found that it lacked sufficient evidence as to the consistency of its use for

income-generating purposes. In either case, we conclude that it was not clearly erroneous for the court to exclude this amount from its calculation and instead to reach a compromise figure of $26 per square foot.[21]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In the appeal to the Superior Court, the Board of Assessment Appeals of the City of Norwalk and the city's tax assessor, Michael J. Stewart, were also named as defendants. We refer hereinafter to these parties individually by name as necessary and to the city of Norwalk as the defendant.

[2] We refer to Fairfield Merritview SPE, LLC, as the plaintiff throughout this opinion. The named plaintiff, Fairfield Merritview Limited Partnership, is a related entity. See *Fairfield Merrittview Ltd. Partnership* v. *Norwalk*, 320 Conn. 535, 539, 133 A.3d 140 (2016).

[3] General Statutes § 12-117a provides in relevant part: "Any person . . . claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application . . . to the superior court for the judicial district in which such town or city is situated . . . . The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable . . . . If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes . . . ."

[4] This court, in *Fairfield Merrittview Ltd. Partnership* v. *Norwalk*, 149 Conn. App. 468, 89 A.3d 417 (2014), rev'd, 320 Conn. 535, 133 A.3d 140 (2016), concluded that the trial court lacked subject matter jurisdiction over the plaintiff's appeal. Id., 477–78. Our decision rested on the fact that, prior to the assessment, the plaintiff restructured its business from a limited partnership to a limited liability company. "On the date of the valuation, October 1, 2008, the limited liability company was the sole owner of the property. Nevertheless, Fairfield Merritview Limited Partnership, the limited partnership, was the entity that challenged the assessor's valuation before the board even though it had conveyed its interest in the property more than a year prior to the valuation date. The actual owner of the property, the limited liability company, did not participate in that appeal." Id., 474. We concluded that this was fatal to the plaintiff's appeal and, as such, we reversed the judgment of the trial court. Our Supreme Court, however, reversed that decision and held that the plaintiff's "prompt amendment of the complaint to add the LLC as a party plaintiff was effective to confer jurisdiction on the trial court, regardless of whether the action was instituted by an improper party, the partnership." *Fairfield Merrittview Ltd. Partnership* v. *Norwalk*, 320 Conn. 535, 547, 133 A.3d 140 (2016).

[5] "[F]air market value is defined as the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 25, 807 A.2d 955 (2002); see also *Aetna Life Ins. Co.* v. *Middletown*, 77 Conn. App. 21, 35, 822 A.2d 330 (defining fair market value as "the price that would result from the fair negotiations of a willing seller and a desirous buyer"), cert. denied, 265 Conn. 901, 829 A.2d 419 (2003).

[6] General Statutes § 12-111 (a) provides in relevant part: "Any person . . . claiming to be aggrieved by the doings of the assessors of such town may appeal therefrom to the board of assessment appeals. . . . Such board may equalize and adjust the grand list of such town and may increase or decrease the assessment of any taxable property or interest therein and may add an assessment for property omitted by the assessors which should be added thereto. . . ."

[7] "'The expressions "actual valuation," "actual value," "market value," "market price" and . . . "fair value" are synonymous.'" *O'Brien* v. *Board of Tax Review*, 169 Conn. 129, 137–38, 362 A.2d 914 (1975) (*Bogdanski, J.*, dissenting).

[8] "The comparable sales approach is also known as the market data approach or sales comparison approach. . . . It is a process of analyzing sales of similar recently sold properties in order to derive an indication of the most probable sales price of the property being appraised. . . . After identifying comparable sales, the appraiser makes adjustments to the sales

prices based on elements of comparison." (Internal quotation marks omitted.) *Abington, LLC* v. *Avon*, 101 Conn. App. 709, 711–12 n.4, 922 A.2d 1148 (2007).

[9] "The income capitalization approach consists of the following seven steps: (1) estimate gross income; (2) estimate vacancy and collection loss; (3) calculate effective gross income (i.e., deduct vacancy and collection loss from estimated gross income); (4) estimate fixed and operating expenses and reserves for replacement of short-lived items; (5) estimate net income (i.e., deduct expenses from effective gross income); (6) select an applicable capitalization rate; and (7) apply the capitalization rate to net income to arrive at an indication of the market value of the property being appraised. . . . The process is based on the principle that the amount of net income a property can produce is related to its market value." (Internal quotation marks omitted.) *Abington*, *LLC* v. *Avon*, 101 Conn. App. 709, 712 n.4, 922 A.2d 1148 (2007).

[10] The court agreed with both appraisers that the income capitalization approach was the most desirable method of determining the property's fair market value. The defendant has not challenged this finding.

[11] "A property's highest and best use is commonly defined as the use that will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Emphasis omitted; internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 25, 807 A.2d 955 (2002).

[12] "Direct Capitalization is a method used in the income capitalization approach to convert a single year's income expectancy into a value indication. This conversion is accomplished in one step, either by dividing the income estimate by an appropriate income rate or by multiplying it by an appropriate income factor." The Appraisal of Real Estate (12th Ed. 2001), p. 529.

[13] Pursuant to General Statutes § 12-63b (b), "the term 'market rent' means the rental income that such property would most probably command on the open market as indicated by present rentals being paid for comparable space. In determining market rent the assessor shall consider the actual rental income applicable with respect to such real property under the terms of an existing contract of lease at the time of such determination."

[14] The capitalization rate is considered "the rate a reasonable investor would seek on his capital or equity . . . ." *New Haven Savings Bank* v. *West Haven Sound Development*, 190 Conn. 60, 65–66, 459 A.2d 999 (1983). In other words, the capitalization rate is a projection of the buyer's return on investment based upon a comparison of the property's income producing capacity to its purchase price. Here, both appraisers calculated the applicable capitalization rate by dividing the property's net operating income (NOI) by its sale price. "By dividing the annual net rental figure by the capitalization rate, market value is ascertained." Id., 66.

[15] During the first day of trial, Michel testified that "gross electric basis" means that "the tenant pays a gross rent plus he pays an additional charge for tenant electric directly. And then from that you subtract a vacancy factor, which we discussed, to come up with your potential gross income."

[16] These additional reimbursements included a utility reimbursement of $2.15 per square foot; and an expense reimbursement of $2.65 per square foot.

[17] In arriving at a net rentable area of 243,586 square feet, the court subtracted 6400 square feet from the building's gross square footage of 249,986 square feet. The 6400 square feet deducted represents the common areas located on the first floor, including the lobby, cafeteria, fitness center, and conference room. Both parties agree that this is the proper method of calculating net rentable area.

[18] The defendant has not challenged the courts factual finding as to the market rental value of the subject property. Instead, the defendant claims that the court should have added $190,000 in "other income" to the property's PGI of $6,333,236 before proceeding to the next step in the direct capitalization formula.

[19] At oral argument before this court, the defendant asserted for the first time that the court's credibility determination resulted from an erroneous interpretation of General Statutes § 12-63c. This argument, however, was not raised in the defendant's briefs. "[I]t is well settled that claims on appeal must be adequately briefed . . . and cannot be raised for the first time at oral argument before the reviewing court." (Internal quotation marks omitted.) *JMS Newberry, LLC* v. *Kaman Aerospace Corp.*, 149 Conn. App. 630, 638 n.8, 90 A.3d 249, cert. denied, 312 Conn. 915, 93 A.3d 598 (2014);

see Practice Book § 61-10. Accordingly, we decline to address this argument.

[20] The following exchange occurred between counsel for the plaintiff and Newman:

"Q. All right. And are there building amenities that are specifically leased to tenants?

"A. Well, yes. For instance, the cafeteria, the fitness, the fitness center, the conference center are not leased to tenants, but they're available for use by tenants.

"Q. Okay. And when you said they are available for use, you mean on a—if somebody wants to use the conference room on a particular day, they just—

"A. (Overlapping) Call us up and reserve it.

"Q. —rent it for—"

"A. Right.

"Q. —or for an hour or whatever it may be?

"A. Correct."

[21] We note that, had the trial court included this $14,264 in conference room fees in its calculations, the resulting increase in the property's fair market value would be equal to less than one-half of one percent.

———————————————